And the court will proceed to the second case of the day, Ybarra v. City of Chicago. Mr. Smullins. Thank you, Your Honor. May it please the court, counsel. Good morning, Your Honors. My name is Mark Smullins and I'm one of the attorneys representing the plaintiff, the estate of Rafael Cruz. Your Honors, there's no dispute here that police officers place their lives at risk during the course of performing their duties. We all understand that. It's also undisputed that the ultimate sanction of deadly force may be justified by such officers when reasonably necessary to protect themselves or others from death or great bodily harm. Thus, for example, a police officer who pursues a suspect into a dark alley or who engages in a high-speed pursuit has unquestionably placed his or her own life at risk to some extent. And if the suspect being chased or pursued threatens or menaces that officer with a weapon that could cause death or great bodily harm, then deadly force may be justified, either under the Fourth Amendment or Illinois Wrongful Death Law. But in this case, the attempt by Rafael Cruz to leave the church parking lot was at no point in time, at that point in time, after the incident at 23rd and Wood, now we're at 19th and Ashland, in the parking lot, coupled with the use of or display of a weapon by anyone inside that Tahoe. Your Honors, these defendants... How many seconds had passed from the original shooting into the Lincoln until the church parking lot? Was that about 90 seconds or so? I believe that's correct, Your Honor. Similar to, say, if an individual fired a gun on the marshals in pursuit, 35 or 40 seconds later gets off the elevator, confronted by the marshals, and at that point in time exhibits no weapon, exhibits no ability to exercise or cause death or great bodily harm to anyone in the building. But could the officers see into the Tahoe? They could not. So they knew that there was somebody who had been firing from the Tahoe... Who had fired from the Tahoe, correct? Very, very recently, incredibly. I mean, the city calls it attempted murder. And as far as the officers know, that person is still in there unarmed. That's correct, Your Honor. But once they get to the parking lot, the defendants knew that there had been no exhibition of an ability to exercise deadly force inside that parking lot, and that's why they had to create the story that they would use to justify their actions in shooting at that vehicle, an action which directly, arguably, directly contravened their own department's use of force general order and a breach which a reasonable jury could certainly find to be evidence of willful and wanton misconduct. If you accept the plaintiff's version of events as true, which this Court must do, Rafael Cruz's actions in the parking lot and those of his three passengers did not create a reasonable apprehension of death or great bodily harm, and Judge Kendall agreed with that. She denied summary judgment on that basis, and she instead ruled that because the officers believed that the vehicle exiting created a danger to others, deadly force was justified. But these... Counsel, suppose the officers had been in uniform and a marked car with lights. Would that change things here? I think so. I think it would, Your Honor. I think if the...or, if the officers had, as they should have done in pursuing this vehicle, even though they claimed they didn't do that, turned on their emergency lights and sirens. If these officers reasonably believed that the Tahoe was a danger to others, they had an obligation to use the emergency equipment at hand, not just to attempt compliance from the driver of the vehicle, but to warn the public. There's a car out here that's dangerous, folks. That's why we have our lights and sirens on. This vehicle, this unmarked vehicle, was equipped with that equipment. It had emergency lights. It had a siren, and they didn't turn that on. That's why they denied they were pursuing the Tahoe. Oh, we were only following. If there was a reasonable belief of danger to the public, these officers had the obligation to do that, Your Honors. And that's why they both tried to claim that while they were in the parking lot, initially tried to claim, we didn't start to shoot until he was driving at Officer Reyes. But when they sat down and thought about that, they had to change that story because there's a video. And Your Honors can see the video. It's in the record. The Tahoe wasn't trying to run over Officer Reyes. The Tahoe pulled into the lot, realized they'd made a mistake and there was no exit back onto Ashland, made a three-point turn and tried to get out of the lot. So, they changed their justification again. And Valadez says, I opened fire after I saw the driver's side window being lowered, and I feared that the driver was going to shoot at me. Well, even Judge Kendall agreed that you couldn't accept that version of events as a matter of law because the video shows, the screen grab that's in our brief, shows that the window was already down. Did Valadez say, I saw a hand reaching out from the lowered window? No, he doesn't say anything like that. And even Officer Reyes, the other officer in that parking lot, when she got into her deposition says, geez, I don't remember if the window was up or down. I could see the profile of the driver's face, but I don't recall if the window was being lowered. In fact, Your Honors, Officer Reyes offers no rational reason or justification for her decision to open fire on the Tahoe. What would you make of the fact that the Tahoe was the venue for the shootings earlier, those five shots coming out? I'm sorry, I don't understand. Well, the shooting, there was five shots coming from the Tahoe originally, right? At least five, yes. So, that's a violent vehicle to start with, right? Correct. And the conduct of the driving subsequent to the shooting before the parking lot sounds pretty violent, too, doesn't it? I mean, bumping into other cars and crashing. There's certainly, the driver of the vehicle... I mean, it's not speeding away from a speeding ticket or something. That's true, Your Honor. And if there had been some indication... Well, they knew there were weapons in that car, right? They knew there was a weapon in the car, but they didn't know if the gun had been emptied, and they didn't know... They didn't know if there's other guns either, too. That's true. So, we got to look at that focus of the reasonable conduct of the officer. Reyes testified. She admitted that the vehicle was not coming at her, that that was not the reason she opened fire. The only justification Reyes gives for opening fire was, I heard shots. You can hear from the audio of Officer Reyes screaming, stop the car, stop the car. Her state of mind. She hears shots. She claims she doesn't know if it was the police or the people in the van, but immediately after firing, she says, shots fired by police. Somebody's shooting, so I'll guess I'll shoot, too. If somebody from the van had been shooting at these officers, they obviously had the right to use deadly force, Your Honors, but they didn't. They didn't have that. From the facts in the record before you, and the inferences reasonably drawn therefrom, when read favorably to the plaintiff, they simply can't support a reasonable officer's non-wilful and wanton officer's belief that the use of deadly force was proper. Can I ask you about a passage in your reply brief? Sure. On page six, you wrote, in this case as in Horton, when the undisputed evidence is viewed in the light most favorable to plaintiff and factual disputes are resolved in her favor, defendant's conduct falls within the hazy border of force that the law has neither declared excessive nor deemed constitutional. That sounds like a good description of a case for qualified immunity. Am I misreading that? I'm quoting Judge Dow. In this case as in Horton. Right. If that's the position that the court takes, I'm standing before you recognizing that my section 1983 excessive force claim stands on less strong footing than does the willful and wanton claim. Okay, so how can an officer, I'm really struggling with how an officer can act reasonably under the Fourth Amendment and be deemed to act willfully and wantonly under Illinois law. Well, I point to Judge Dow's decision in Horton. Even Judge Kendall found that there were genuine issues of material fact with respect to the conduct of the police officers, other than her assertion that they were entitled to shoot the vehicle as a fleeing felon. So if there are questions of genuine issues of material fact and I lose on the qualified immunity issue based on Horton, it's my position that the willful and wanton claim stands. This wasn't a case where these officers were threatened or menaced by a deadly weapon. They saw a weapon being used, but it wasn't used or pointed at them. They didn't see that in the parking lot. They're at the being glib about this. Their duty is to serve and protect, right? That is correct, Your Honor. And they're looking at a car that in which somebody attempted to commit murder. They could reasonably conclude moments earlier, right? Correct. And they're supposed to let him go? No, no, they're not supposed to let him go. What they're supposed to do is to turn on their lights and sirens and wait until the troops arrive, because they're in an unmarked car. So they had a justification for not initiating pursuit. You can see from the video, once the van leaves the parking lot and Mr. Cruz has been mortally wounded and crashes down the street, how long it takes for the troops to get there. We're not talking about a shooting or an incident that happens in Mendota when there are two police officers on duty on the midnight shift. This is the 10th district in the But the commander and his intelligence officer are out performing an intelligence check. This isn't a case where the occupants of the vehicle ignored commands from police officers. A reasonable jury could conclude that they didn't know who these people were. These two people with guns in the parking lot screaming, stop the car, stop the car. Under those facts, it's our position that can be deemed by a reasonable jury to be willful and wanton. Do you want to save some time, Mr. Smallwood? Yes, Your Honor. I would like to save some time for rebuttal. Thank you. Ms. McGraw? May it please the court. As plaintiff's counsel just acknowledged, the officers couldn't let this car go. Had they let the car go, it was reasonable to expect that that car could have hit another vehicle or hit a pedestrian. It was reasonable to expect that because this car was full of people who were driving in rival gang territory and firing at rival gang members, that they might encounter another rival gang member and open fire again. It simply wasn't reasonable to let the car leave that parking lot. But to step back, turning first to the the Fourth Amendment claim, with respect to that claim, there are two different bases to affirm summary judgment for defendants. First, the officer's use of force was objectively reasonable under the Fourth Amendment. Here, the officers used force to prevent the escape of suspects whom the officers had witnessed using a deadly weapon. Cruz was also driving incredibly dangerously. Cruz and his passengers posed a threat to the public and, in fact, plaintiff has not developed any argument otherwise. So, Ms. McLaughlin, the thing that gives me the greatest pause in this case is the plainclothes, the unmarked car, and the apparent failure to activate lights or sirens. For all the the the occupants of the Tahoe knew, these were rival gang members chasing them. Your Honor, first of all, with respect to what the occupants of the Tahoe knew, the standard is what's objectively reasonable from the people in the Tahoe knew would not be relevant to that inquiry. So, if you're the police officer in the unmarked car, and you're trying to project and understand the position of the folks in the Tahoe, what is the signal to them that they're running from the police and not from another gang? I think that we should focus on the 16 seconds in the parking lot because the conduct that's challenged here is the shooting of Mr. Cruz. It's not the pursuit. So, at the moment when we're in the parking lot, the officers exit their vehicle. They're wearing police vests. They're wearing duty belts. It's a man and a woman. It's night. It's night. They get out of that car at night. Oh, the theory is that people are supposed to recognize that we're plainclothes officers? They are wearing equipment, and it is, we submit that from the perspective of a reasonable officer, that a reasonable officer would expect that they would not be mistaken for rival gang members. Are you familiar with our opinion in Dornbos against City of Chicago? Vaguely, Your Honor. A couple of years ago, involving plainclothes officers taking down a man who did not stop immediately, there was a factual dispute about whether they ever identified themselves as police officers. But plainclothes, I don't claim to be an expert, but plainclothes officers who don't identify themselves look like gang members and thugs and can easily be mistaken for that. And what they are doing is tortious if it's not, and it would be criminal if they weren't police officers, right? Correct. And in Dornbos, I think that the issue was that the person, the victim, could have mistaken that plainclothes police officer for someone else. Why not here? Because it is not, from the perspective of the police officer, one would not think that rival gang members are going to exit the They're not going to look like a man and a woman in police vests. They're not going to be wearing duty belts. You've got about a half a second to process that information, right? If I'm the driver of that Tahoe. Yes, and if you're the officer as well. Yeah. So I do want to be sure to point out that the case law instructs the court to take into consideration the fact that the officers are making a split-second decision under enormous pressure. It was 90 seconds from the shooting. It was 16 seconds in the parking lot. Again, of course, Dornbos does hold that a police officer, it does need to be apparent to the reasonable police officer that they are being, that the person would believe the police were trying to to stop them. But here I think we do have that. We do, we don't have a situation where these officers are undercover dressed as, in a way that would be presented as gang members. They are wearing their police equipment. They are exiting in a manner in which they are commanding this car to stop. And in fact, we also have testimony from Commander Valadez that he twice identified himself as police. There is plaintiff attempts to dispute that fact by saying that the people in the car did not hear it, but under this court's precedent that in itself doesn't create a dispute effect as to whether the officers use force. Not only was the officers use of force objectively reasonable, but the officers are also entitled to qualified immunity. Plaintiff notably has the burden to point to precedent that shows the right to be free from deadly force under the circumstances. Here it was clearly established and she has not met that burden. And then as to the state law wrongful death claim, there are also two bases to affirm summary judgment on that use of force was justified under Illinois law. And in fact, plaintiff does not address that basis for the district's court's holding. We submit she's waived her challenge to the district court's judgment on her state law claim and count to for that reason. Alternatively, defendants are immune from liability under the Tort Immunity Act. The officers here were engaged in the execution and enforcement of the law under Section 2202 of the Act. They are liable only for willful and wanton conduct. Here the officers were acting to protect the safety of the public. Their conduct was not willful and wanton. Why isn't that a jury question here? It's not a jury question because the facts, the undisputed material facts here do establish that cruises, the conduct of cruising as passengers, pose a threat to public safety. So as you know the encounter begins when the officers see a passenger and the vehicle fire directly into another car. The officers know that the people in the car have a gun and had actually used the gun. And so the threat to the public safety when we combine not only that but also the fact that cruise hits three different cars in the course of this encounter, all of that clearly presents a threat to public safety. So summary judgment is appropriate on the state law claim. I think Plaintiff's position is that you can just never grant summary judgment on a willful and wanton conduct issue. That's not the case. In state court it is is frequent when their undisputed facts show that the conduct was not willful and wanton. Summary judgment is appropriate. Is it correct that the police car here had lights and a siren? They did not activate lights and siren. But they had them. I believe the record says that they they did have that. Again though I would note that the challenge conduct isn't the pursuit. The challenge conduct is the the shooting. And so plaintiff suggests that the pursuit or following whatever you want to call it was contrary to general orders. Plaintiff doesn't actually support that with any citation to a general order explanation. But even were that the case that's not a constitutional standard. That might be a violation of police regulations but that's different from an evaluation of whether the conduct was constitutional. We're not here discussing police policy but rather a constitutional issue. I would note that in both plaintiff's briefs to this court and in plaintiff's argument to the court today, plaintiff doesn't explain why the officer's conduct was not justified because Cruz and his passengers posed a threat to public safety. Plaintiff focuses rather on whether the officer's own safety was in jeopardy. We do we do present that as an alternative basis for affirmance. But the basis for the district court's safety and plaintiff has not developed any argument for reversal on that basis. Of course underdeveloped arguments being waived, the court should affirm the judgment on the Fourth Amendment claim. With respect to the qualified immunity claim, we do in our brief go through each case upon which plaintiff relies and I'll rely on my brief for the discussion of all those cases and why they don't clearly establish that the officer's conduct was outside the bounds of the Fourth Amendment here. But I think it's important to point out that to the contrary, the case law would suggest to a reasonable officer that the use of force here was constitutional. We repeatedly cite Plumhove versus Rickard in which the Supreme Court held that officers acted reasonably in firing on a driver who was driving recklessly, threatening others on the road, and appeared intent on resuming his flight from the police. Here we have reckless driving. Beyond just reckless driving, we have several accidents and including what appears to be an attempted battery by the vehicle on the officer's own car. And then we have the firearm in the vehicle that the suspects had just used 90 seconds earlier. So the argument that the use of force here was constitutional is stronger here than in Plumhove. We also cite this court's case in Scott versus Edinburg where an officer was held not to violate the Fourth Amendment in firing at a driver of a stolen car who was putting people in the vicinity in danger. And so under that precedent, the right to use deadly force here would appear to any reasonable officer to be constitutional. So on count one, district court's either because the use of force was constitutional and because plaintiff has waived any argument to the contrary, or because the officers were entitled to qualified immunity. Could I try a variation on the facts with you as well, Ms. McLaughlin? Suppose the officers had not seen, there had been no firing into the Lincoln. They're following a car. The car decides we're being followed and starts to accelerate, goes into, drives quickly. And then we see the car careen around the corner, hit the, and then drive into the church parking lot. At that point, do you think Illinois law or the Fourth Amendment would allow the However, as you know, the Fourth Amendment issue is very fact-specific. Fleeing from an unmarked car? I think that... That's not operating lights and sirens? At a minimum, the officers would be entitled to qualified immunity. But again, a Fourth Amendment claim being fact-intensive, without having the full facts, it is a little bit difficult to to speculate how the the Fourth Amendment would apply. But certainly here, we have more than that, more than the hypothetical. We have the the witnessing of what to a reasonable officer would have appeared like an attempted murder. And that takes us well beyond a mere traffic stop that leads to a fleeing vehicle, or even something like in Scott versus Edinburgh, where we have a stolen car that leads to a very short pursuit ending with the shooting. This goes well beyond that. So I would at least suggest that if you don't have the original shooting, you might very well have a scene. And you do have the car careening around the corner, fleeing, hitting those cars. You might well have somebody who's an impaired driver, perhaps by medication, perhaps by insulin shock, something like that, right? And surely deadly force is not the the first resort in such cases? No, I don't think that deadly force would be the first resort. But of course it would depend on how the whole situation developed and how it would appear to a reasonable officer, who of course would not know why the driver was impaired. Here, we know that the driver was impaired with cocaine, marijuana, and alcohol. The officers wouldn't have known that. But they did have the opportunity to watch that car in motion and understand the threat that it posed to the public. Very briefly, with respect to the state law wrongful death claim, the district court explained two separate bases for summary judgment on that claim. The first was that the use of force was legally justified under state statute. Plaintiff does not address that basis for the district court's decision. The court should affirm the judgment on count two. But alternatively, the city is also entitled to immunity under the Tort Immunity Act. As I've explained, the officers' conduct here was not willful and wanton. The officers were attempting to apprehend suspects who were driving recklessly and did pose a threat to the public for that reason and because of the attempted murder that they'd just seen. And so, immunity would apply here as well. Do you have something further? No, if the court has no further questions, we request that the district court's judgment be affirmed. Thank you, Ms. McLaughlin. Mr. Small. Just a couple of points, Your Honors. First of all, the plaintiff is not as a matter of law and summary judgment. If this is Brecht versus Cortez, where there's a question of whether the officer was pursuing a motorcyclist, stopped the pursuit, and the motorcyclist then went off the road, was impaired, and went off the road and killed the passenger, that's not what we have here, Your Honors. If there had been pedestrians or other motorists in the area who were endangered by the actions of the driver of the Tahoe, they were more in danger from being struck by a car which is driven by a mortally wounded driver, which is what happened here. After Rafael Cruz was shot, he pulled out of the parking lot and crashed into multiple cars down the street. If there had been a pedestrian out there, they were endangered not by Rafael Cruz, but by his having been shot, or by bullets missing the car. There's no evidence that every bullet that was fired by Valadez and Reyes struck the car. Those bullets can go anywhere. Counsel tells us that a reasonable police officer could believe that the occupants knew that they were the police because Valadez identified himself. You can hear Reyes on the radio. She's talking. If Valadez is announcing his office in the command voice that we all know he has, because he's gone up from the ranks from patrol officer to commander, you'd have heard him on there saying, stop police, or something to that effect, and he didn't have it. Your Honors, general order violations have been found in a multitude of Illinois cases to have been potentially, or up to the jury to conclude, whether or not that was willful and want. And finally, with respect to Scott, in Scott, the vehicle driven by the decedent was driving at the officer and he fired when he feared that his life was in danger. The defendants tried to make that claim here, but when the video came out, that claim was vacated. They no longer went with that. Your Honors, on behalf of the plaintiff, I would ask the judgment be reversed, or at bare minimum that the judgment as to the wrongful death claim be reversed, and we take our case up the street. Thank you for your kind attention. Thank you, Mr. Smollett. Thanks to all counsel. The case is taken under advisement.